470

PASCUAL RAMÍREZ ORTIZ, Plaintiff and Appellee, v. ELIEZER and ROSENDO GAUTIER BENÍTEZ, Defendants and Apellant the latter.

No. 257.   Decided February 27, 1963.

*A. Mieres Calimano* for appellant. *Guillermo S. Pierluisi* and *Francisco M. Monserrate* for appellee.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

On June 1, 1954, Rosendo Gautier Benítez, a constructor, was in charge of the construction of a building in Ponce de León Avenue, Santurce. His brother, Eliezer Gautier Benítez, 29 years of age, who had his own home in the place "Las Parcelas" of the ward of Sabana Llana, Río Piedras, also worked as foreman in the building. Work in the project began at seven in the morning and ended at four in the afternoon. Eliezer was the owner of a small bus, a station wagon model; he used it to go to and from work. This vehicle was not used in any activity of the project nor in any business of Rosendo Gautier. The materials for the project were taken in vehicles belonging to the suppliers.

After four o'clock in the afternoon of that day, Eliezer, who had already finished his daily work as foreman, was returning home driving his own vehicle. While driving along 65th Infantry Avenue, he had an accident with Pascual Ramírez Ortiz, who was pushing a handcart at the time on the same avenue. Ramírez Ortiz was seriously injured.

On October 7, 1954, and before the San Juan Part of the Superior Court, Pascual Ramírez Ortiz filed a complaint against the brothers Eliezer and Rosendo Gautier Benítez, claiming $25,000 for damages suffered as a result of the accident. Respecting the former—Eliezer—he alleged that the latter had negligently run over him with a motor vehicle while he was using the afore-mentioned public road. Respecting the liability of Rosendo Gautier Benítez, he stated:

"2.—At the time of the accident defendant Eliezer Gautier Benítez acted as agent or employee of defendant Rosendo Gautier and in the course of his employment."

472

The defendant brothers answered the complaint. Eliezer, in synthesis, denied that there was any negligence on his part in the accident and stated that "it was due to the contributory negligence of plaintiff." Besides, they alleged:

"2. In answer to the facts alleged in paragraph 2 of the complaint, defendants deny, as false, that Eliezer Gautier Benítez acted at the time of the accident as an agent or employee of the defendant Rosendo Gautier, and that the accident occurred in the course of his employment, alleging that at the hour, place, and date in which the accident occurred, defendant Eliezer Gautier Benítez was driving a vehicle of his own property and for personal purposes."

The issue being thus joined on those concrete terms, the case went to trial. At the trial held October 6, 1959, plaintiff was represented by different attorneys from those who had filed his complaint. Plaintiff's witnesses were Julio Torres, José A. Ortiz Ramírez (sic), and plaintiff himself, Pascual Ramírez Ortiz, and for defendants only Rosendo Gautier Benítez testified. At that time Eliezer lived in New York, where he had moved with his family for over two years.

On December 21, 1959 judgment was rendered sustaining the complaint and ordering both brothers Eliezer and Rosendo Gautier Benítez to pay plaintiff in solidum a compensation amounting to $12,000. The former, according to the court, "shall pay for his negligence and *Rosendo Gautier in compliance with his contractual obligation.*" (Italics ours.) The trial court made the following conclusions:

"Plaintiff is an unskilled worker who about four o'clock in the afternoon of June 1, 1954 was pushing a handcart, with food for pigs, on 65th Infantry Avenue, going from Río Piedras to Carolina.

"Codefendant Eliezer Gautier Benítez, who was driving a motor vehicle, apparently of his own property, ran over plaintiff who was walking on his right and who did not commit any negligent act whatsoever to bring about the accident.

"The evidence introduced at the trial as to the way in which the accident occurred shows that it was due to the gross negligence of codefendant Eliezer Gautier Benítez, younger brother of the other defendant, Rosendo Gautier. Eliezer was foreman and employee of Rosendo in one of the latter's works as contractor. When the accident occurred, Eliezer told plaintiff not to worry that his brother would pay for the expenses.

"On the day after the accident, in the morning, José A. Ortiz, representing plaintiff, went to Rosendo's residence to talk to him about the accident and Rosendo admitted he was responsible for the damages caused by Eliezer. In Mr. Ortiz' presence Rosendo called the vehicle's insurance company, but an employee of the latter informed him that the policy had expired thirteen days ago. Rosendo gave Mr. Ortiz $20 to cover plaintiff's expenses and told him that if he needed more to come back. He did not ask his brother Eliezer to pay for the $20. Ortiz did not return to Rosendo and on October 7 plaintiff filed the complaint against both defendants, who have been represented by the same attorney.

"In the accident plaintiff suffered fractures in both legs. During a year and a half he lay in a cast at the Municipal Hospital of Río Piedras. He underwent an operation wherein he was applied orthopedic nails. He has a big scar in his left leg, and in spite of the fact that five years have elapsed he is still under treatment. We believe that the damages suffered by plaintiff amount to twelve thousand dollars ($12,000).

"*Conclusions of law.*—There is no difficulty in stating that Eliezer Gautier Benítez, through his negligence, caused the accident and therefore he should compensate plaintiff for the damages; but since his older brother and employer is also defendant, we have to decide on the latter's liability.

"It is true that Rosendo Gautier Benítez denied in his testimony in court that the vehicle involved in the accident belonged to him; that Eliezer was in the course of his employment, and that he assumed liability in the presence of plaintiff's counsel. But upon analyzing the entire evidence in this case we reach the definite conclusion that we should give credit to the evidence of the plaintiff and therefore we hold that Eliezer, at the time of the accident informed plaintiff that his brother Rosendo would take care of the expenses; that Rosendo called the insurance company to settle plaintiff's com-

pensation; that he gave Mr. Ortiz $20 and he offered to give him more; and that he accepted his liability for the damages suffered by plaintiff.

"Under these circumstances the complaint is sustained as to both defendants so that both, in solidum, must compensate plaintiff. Rosendo bound himself wilfully and validly to compensate plaintiff, and this in itself is sufficient, since there are many possible causes or reasons why Rosendo bound himself. They may be some of the following: (1) That Eliezer actually was in the course of his employment with Rosendo in a vehicle belonging to Rosendo; (2) that the commercial, working or family relations between the two brothers pointed out to Rosendo his duty and his liability in this case, and (3) the convenience of Rosendo in his public relations not to question his liability, etc."

Only Rosendo Gautier Benítez appealed from the judgment and in synthesis he assigns as fundamental error that the trial court decided that he was bound to compensate plaintiff for all the damages that the latter suffered as a result of said accident.

The careful analysis and study which we have made of all the oral evidence introduced by the parties, of its probative value, true significance, and juridical scope has absolutely convinced us that this fundamental and serious error was clearly and evidently committed and that, consequently, the judgment appealed from, inasmuch as it refers to and makes codefendant Rosendo Gautier Benítez liable, should be reversed and the complaint should be dismissed as to him.

As we already stated, codefendant Rosendo Gautier Benítez, through the only complaint, was required Aquilian responsibility because "at the time of the accident" his brother Eliezer was acting as his agent or employee and "in the course of his employment." However, the judgment against him was grounded on a very different cause of action, that is, on a "contractual obligation" because "Rosendo bound himself voluntarily and validly to compensate plaintiff and this in itself is sufficient. . . ."

Respecting that alleged assumption of liability "for the damages suffered by plaintiff," we find the following incidents and statements in the transcript of evidence:

The first witness who testifies is Julio Torres, who alleges having witnessed the accident. Among other things he stated that while the injured person was placed inside Eliezer's vehicle the latter told him: "Don't worry, we shall pay for the expenses; my brother will pay for the expenses." Defendants' counsel requests the elimination of these statements and the court eliminates them respecting Rosendo, setting forth that: "It shall be understood that this statement does not bind Rosendo Gautier." Tr. 4.

The second witness was José A. Ortiz, plaintiff's brother, who testified that he knew of the accident about seven thirty in the evening of the following day; that then he went to the hospital; that a doctor requested a liter of blood for a transfusion and that he was then given "a paper stating that a liter of blood was needed"; —Tr. 37—that he went to Rosendo Gautier's father and explained "the matter of the blood and he told me that there was nothing he could do."—Tr. 10; that then he spoke with Rosendo and the latter gave him $20 to buy the blood and that, besides, he told him:

"That he was responsible for the accident . . . that he was liable for the damages."—Tr. 10.

The elimination of these words was requested and the judge denied it because "it is a statement against the interest of defendant himself which is admissible."

This witness also testified that Rosendo Gautier called "the insurance company to see if he could include the car so that he could send him to the hospital, but the insurance company answered that it was thirteen days since the insurance contract had expired and that he had not renewed it." Tr. 11.

When he was asked if "don Rosendo gave you something to take to his brother," he answered: "$20 . . . to help with

the blood and he told me that if I needed something else to go there. Then I needed money and took it from Blas Benítez for a liter of blood and I did not go there." Tr. 11. As he himself stated, this other liter of blood was needed the following day. Tr. 37.[1]

Pascual Ramírez, plaintiff, repeated what his first witness had stated, that is, that when he was being taken to the hospital, Eliezer told him: "Don't worry, my brother Rosendo is going to pay you; I'm going to speak to him about giving you a little money." Tr. 20. At defendants'

---

[1] From the cross-examination of this witness we copy the following:

"Q. How much money did Rosendo give you?

"A. $20.

"Q. Did he give you money at any other time?

"A. He gave me nothing else because I did not go to him.

"Q. Before filing the complaint, didn't you go to him and ask him to give you a certain amount?

"A. He told me, in the Río Piedras Court, in front of the police station, 'that why had I done that?' Then I told him that they had not acted properly, because even his brother went to my house.

"Q. That why had you done what?

"A. That why had I sued him.

"Q. Didn't you say that you never saw him after the $20 for the blood?

"A. At the trial in Río Piedras, where the case was filed because I was not allowed to speak to the boy, I answered that I could not, I had to sue because he had made himself responsible for the damages.

"Q. Why didn't you say to him: 'give me $2,000?'

"A. They said they would return and didn't do so.

"Q. Wasn't it that you went to Rosendo's house?

"A. Yes, sir.

"Q. Is it true or not that you went to Rosendo's house to get $20 for a blood transfusion?

"A. Yes, sir.

"Q. An did he give them to you?

"A. Yes, sir, and he said, I will answer for anything that happens.

"Q. I will answer for anything that happens?

"A. Yes, sir.

"Q. How many days elapsed since the day in which he gave you the $20 until you saw Rosendo again in court?

"A. That was about three months.

"Q. Wasn't it more than a year? This case could not be tried because this man was in the hospital?

"A. It was suspended several times. I took him to court in my arms.

request these statements were also eliminated by the court respecting codefendant Rosendo Gautier. Tr. 20.

With the explanation that these statements are repeated in the course of the oral testimony, they represent the only evidence introduced by plaintiff tending to show the alleged assumption of liability by Rosendo Gautier, and for which he had not been sued. On the basis of these testimonies the trial judge concluded that "Rosendo bound himself voluntarily and validly to compensate plaintiff and this in itself is sufficient."

---

"Q. When was it that he went to court after the accident? Wasn't it after a year?

"A. After a year, in Río Piedras.

"Q. During that year, did you go to this man to tell him: 'since you said you were liable, give us such an amount of money?

"A. I didn't go because neither of them paid any attention. I said: Let's go to court.

. . . . . . .

"Q. Have you at any time gone to this man to tell him: you promised to pay for the damages, give us so much?

. . . . . .

"A. I went to him once.

"Q. You went?

"A. I went once for the blood, to see what I could do.

"Q. Did he give you the $20? After that, did you go back to him?

"A. I did not go back.

"Q. Do you know whether your brother went back to him?

"A. He did not go back.

"Q. Was this conversation when this man said, as told to the court, I am responsible for that; was it in the presence of his brother?

"A. In the presence of Visitación Sáez.

"Q. Was it in the presence of this gentleman?

"A. No, sir.

"Q. Did you tell that to your brother?

"A. I explained to him what the gentleman had spoken about.

"Q. What did your brother say?

"A. He said nothing. We shall see.

"Q. Your brother did not accept it?

"A. He accepted the statement; but since he couldn't do anything, I took over the issue with Visitación.

"Q. If he admitted it, why did your brother never go to this man to be paid?

. . . . . . .

"A. Because that is a matter which had to go to court with his attorney and I could not do that; because I am not authorized to do so."

When plaintiff finished introducing his evidence, defendants requested the elimination of Rosendo Gautier Benítez as a defendant party. The trial judge denied it in the following terms:

"Hon. Judge: It must be proven that a commercial vehicle has been driven at the time of the accident by an agent or employee of the employer in the course of the employment. That is required by the law. The motion for dismissal does not lie in my opinion, as to Rosendo Gautier if he told José A. Ortiz, plaintiff's brother, that he was liable for the damages which plaintiff might suffer, that he gave him the $20, that he told him if he needed more to come back. It is dismissed in view of this evidence."

The testimony of José A. Ortiz, plaintiff's brother, and the only person who, for one moment spoke with Rosendo Gautier Benítez on June 2, 1954 to ask help to buy a liter of blood, did not remain uncontradicted in the part of the assumption of liability. It was specifically and categorically contradicted by Rosendo Gautier Benítez himself,[2] although the trial judge did not give entire credit to his testimony.

---

[2] His examination to that respect was as follows:

"LIC. MIERES CALIMANO:

"Q. Your name?
"A. Rosendo Gautier Benítez.
"Q. What is your profession?
"A. I am a constructor.
"Q. In relation to this case, to the automobile involved in the accident in this case, did it belong to you at any moment, or at any time, or on any date?
"A. No, sir.
"Q. Whose car was it?
"A. It was my brother's.
"Q. Now I am asking you: did you hear the statement made by this witness, who said that you had promised to pay for all the damages in this case?
"A. Yes, sir.
"Q. Is that true?
"A. It is not true.
"Q. Do you know what a complaint for damages is?
"A. Yes, sir.
"Q. Have you dealt with important contracts?
"A. Yes, sir.

When he was questioned on his cars' insurance he answered:

"Q. Look Rosendo, tell me something: You said that your brother lived in Las Parcelas, in the road from Río Piedras to Carolina?

"A. Of Sabana Llana.

"Q. Tell the court whether this vehicle which was in the accident with this man, with Ramírez, belonged to you at any time?

"A. At no time.

"Q. But you are positively sure?

"A. Very sure. I have very many brothers and each one has his own car.

"Q. How many automobiles do you actually have?

"A. Three automobiles.

"Q. And at that time, how many did you have?

"A. I had possibly two or three. I know I had more than one.

"Q. Do you know what a citizen's liability is?

"A. I have performed works for the government. I have just finished constructing the building for the Employee's Association.

"Q. Are you a man who is aware of the liability which one may assume through a contract?

"A. Yes, sir.

"Q. Who constructed the building of the State Insurance Fund?

"A. I did.

"Q. In other words, you know what liability is?

"A. Yes, sir.

"Q. Did you at any time tell this man, to plaintiff's brother or to any other person in Puerto Rico that you would be responsible for the damages?

"A. At no time.

"Q. And what about the $20?

"A. He came at a critical moment, when a brother of mine has had an accident and he does not have a cent to pay for a blood transfusion; what is my duty as a brother and as a humanitarian? To give him the money.

"Q. How much did you give him?

"A. Some $20, I don't remember exactly.

"Q. Did you give them to him as a gift?

"A. Yes, sir.

"Q. Did you believe at any moment that you assumed liability because of your contribution to a blood transfusion so that a human being would not die?

"A. At no time. That is not possible." (Tr. 22–25.)

"Q. Were your automobiles insured?

"A. They were always insured.

"Q. Are you positively sure that when this man went to speak to you it was very late?

"A. It was already dark. It was after the accident.

"Q. In other words, you could not have called any insurance company had you wanted to?

"A. It was impossible. The case was not even mine."

In view of the facts and circumstances taken as a whole, there was no difficulty whatsoever, as the trial judge stated, to conclude that codefendant Eliezer Gautier should compensate plaintiff for the damages he suffered. However, respecting codefendant Rosendo Gautier, the evidence introduced by plaintiff failed to prove satisfactorily the essential allegation that "at the time of the accident defendant Eliezer Gautier Benítez acted as agent or employee of defendant Rosendo Gautier and in the course of his employment." It is inferred from some of the statements of the trial judge in the course of the trial that he was of this opinion while he considered the case independently of the promise to pay for the damages attributed to Rosendo and, he was, evidently, of such opinion when he grounded his judgment against Rosendo Gautier exclusively on a "contractual obligation" and not on the Aquilian fault with which he was charged in the complaint.

What was considered a "contractual obligation" by the trial court was the act of Rosendo Gautier in telling plaintiff's brother (when he was requested to give financial aid to buy blood for the transfusion), that he was assuming responsibility for the damages suffered by plaintiff.[3]

Let us see whether such unilateral declaration of intention—accepting its existence as the trial judge accepted it and its admissibility in evidence—was sufficient by itself

---

[3] Sometimes the witness referred to that statement as "what the gentleman had spoken," or "the statement" of Rosendo Gautier. Tr. 16.

to oblige its author to compensate the damages ascribable to his brother Eliezer.

The declaration of unilateral intention which juridical science deems binding is the promise or expression of unilateral, autonomous, gratuitous, revocable, and unaccepted will, by which, with certainty, we impose upon ourselves the firm obligation to give, to do, or not to do a particular thing for the benefit of another, which is capable of conferring upon the latter the right to demand compliance therewith, or to be compensated for the consequential damages actually suffered for whatever was done in view of said promise, and actually induced thereby.

■ Our Civil Code does not recognize nor regulate the unilateral declaration of intention as a source of obligations.[4] These are created, as provided by § 1042 thereof, by the law, by contracts and quasi-contracts, and by the illicit acts and omissions, or by those acts in which any kind of fault or negligence occurs.

With the exceptions of the promissory oath, of the vote, and the unilateral promise of undertaking in favor of a municipality, in Roman Law the mere unilateral declaration to assume an obligation was not sufficient to give birth thereto. Even the simple pact did not create a binding civil cause.

■ The problem of the unilateral intention as a possible source of obligations has been universally discussed in continental European countries. All the writers admit that juridical tradition has been opposed to the obligatory nature of the unilateral promise. Some have accepted the principle of the unilateral declaration as creating obligations, others, the minority, have rejected it. Castán states that

---

[4] But it is not a strange idea to the Code. Its §§ 753 and 754 are concerned with the promise of an extra portion, its § 1340 with the promise to sell or buy, and its § 1761 with the promise to constitute pledge or mortgage, rather as precontracts or preparatory or preliminary contracts made as antecedents of perfect and definitive contracts.

it ought to be recognized that every day the doctrine has a greater number of followers and that in the field of legislative policy we can see that the most modern Codes accept in certain cases the obligatory efficacy of the unilateral promise, quoting those of Germany, Switzerland, Italy, Brazil, Mexico, and Perú.[5]

Section 1089 of the Spanish Civil Code—which corresponds to our § 1042—does not mention the unilateral intention as a source of obligation, but, as Castán states in his aforecited work, neither does it consider it as an unsurmountable obstacle for its technical construction, and Garrigues maintains that said section strictly contains no rule, but a classification which can not bind the interpreter.[6] ALBADEJO, in 1 *Instituciones de Derecho Civil* 613 (1960), states that the silence kept by § 1089 on unilateral intention would not be an obstacle to consider it a source, "since we have seen (aside from its imperfections) that it does not

---

[5] 3 *Derecho Civil Español, Común y Foral* 61 (8th edition).

The Mexican Code, 1932 ed., recognizes and regulates various acts, under the heading "Of the unilateral declaration of intention," in its §§ 1860 to 1881. The first four state [our translation]:

"Section 1860—The fact of offering objects to the public at a specific price, binds the owner to maintain his offer.

"Section 1861—Any person who binds himself through announcements or offers made to the public to any undertaking in favor of whomever fulfills a particular condition or performs a certain service, assumes the obligation to comply with the promise.

"Section 1862—Any person who under the terms of the aforesaid section performs the required service or fulfills the condition set forth, may require the payment of the reward offered.

"Section 1863—Before the service is performed or the condition fulfilled, the promisor may revoke his offer, as long as the revocation is made with the same publicity as the offer.

"In this case, whoever proves that he has made expenditures to perform the service or to comply with the condition for which a reward was offered, has the right to be reimbursed."

See III *Compendio de Derecho Civil* 198–231 (1962), of the Mexican Professor RAFAEL ROJINA VILLEGAS.

[6] II *Curso de Derecho Mercantil* 70.

enumerate all the sources contained in our own statutes, and the unilateral intention could be one of those which are not enumerated." Hernández Gil is one of its most enthusiastic supporters.[7]

---

[7] In volume 1 of his work *Derecho de Obligaciones* 246 and 247 (1960), he states, in part:

"84. c. *The Unilateral Promise.*

"Finally, we must include in this group the *unilateral promise* as a source of obligations. The problem has been debated. Our juridical order does not confront it directly and case law (in contrast with the excellent task of progressive perfecting developed apropos of diverse matters) has not clearly decided it. On principle we must maintain, in agreement with the most generalized opinion, that although not every unilateral declaration of intention is always and without more creating any obligation, the promise of an undertaking (in which all the requisites corresponding the latter are present) it is in certain cases endowed with binding force.

"To attach binding force to the unilateral promise is, without prejudice to some Roman and Germanic antecedents, a relatively recent conquest. In the juridico-psychological level, the maximum concession to the intention in the creation of obligation is represented by the fact that by the mere action of a single will (without the presence of another agreement which will give rise, in broad terms, to the figure of the contract), the drawer becomes the obligee. The obligation in this case is, in the most absolute sense, a self-imposed obligation. The duty incorporated into the unilateral declaration presupposes the acknowledgment of an autonomous power. And, yet, there is the circumstance that the attribution of binding force to the unilateral promise does not coincide, at least in its development, with the dogma on the autonomy of the intention. It is a subsequent achievement which treads its way through the period of rectification and crisis of the dogma of autonomy, and which stemming, of course from the power of the intention, caused its juridical efficacy to fall not so much on itself, but rather in the freely-made pact. But it should be noted (and hence, the contradiction indicated is only apparent) that it is not in itself an overestimation of the intention, to derive therefrom as ultimate consequence, what has led to the recognition of the unilateral promise as a source of obligations. The thesis has been laid down not on psychological grounds of a voluntary character, but principally by virtue of sociological and systematic considerations. It is believed that certain declarations of the individual, concerning interests protected by the law, which acquire a general exteriorization or which are addressed to a concrete addressee, as happens respectively, with the public promise and the offer of contract, can not be relegated to pure discretion; such declarations, constituing promises of a determined action, are endowed with a social trascendency motivated by the drawer's action who, on his own initiative, arouses the interest and the confidence of the others.

Puig Brutau considers the problem in the light of the influence which the unilateral promise may have on another's interest.[8]

The doctrine of the Spanish Supreme Court lacks uniformity respecting the binding force of the unilateral promise. It has assumed contradictory positions in the judgments it has rendered on this point from January 12, 1881 to March 21, 1957. It has denied it on the ground that the obligations can only arise from the causes listed in § 1089; by exception it has admitted the same as a social necessity, on the basis of the spiritualism of the modern law of obligations and of the growth and diversity of

---

And thus, reasons of juridical security and the exigencies of good faith require that the concrete or eventual addressee be entitled to become a creditor, which is only possible if the fulfillment of the promise falls on the promisor as a duty, which promise, by the same token is deemed irrevocable, at least within certain limits. In another aspect, reasons of a systematic character—the explanation of certain juridical effects—have been advanced in favor of the unilateral promise: the obligation which is assumed by the drawee of the title to the bearer before any holder thereof, relies, ultimately, on the unilateral act of the creation; the contract in favor of third persons loses all its own juridical significance if its binding force is made to rely strictly on the acceptance. Something similar occurs with the abstract promise of debt or with the act constituting a foundation. These and other cases of doubtful juridical structure reveal an indisputable background of unilaterality."

[8] In his work *Fundamentos de Derecho Civil,* Tome I, Vol. II at pp. 85 and 86 (1959), comments:

"In our opinion, the problem is not well stated if it is considered that the virtues of a declared intention should be inquired into, disregarding the worth of the interests of the person who may have placed his trust in such intention. It is fitting here to remember that law, in general, acquires sense only as a means to regulate the conflicting interests of two or more persons. Whoever contracts, is bound by the effects of the contents of his intention, insofar as it meets the equally expressed intention of another subject of law. In the contract there already exists, by the mere fact that it is perfected, the favorable presumption to understand that the agreement must be complied with, so as not to prejudice the legitimate interests of the party who has trusted the other. It is a fiction to suppose that the declarant who has unilaterally expressed his intention does not perform an act which may influence another's interests. The binding force resulting from the declaration can not

juridical business.   Its present position is rather favorable to the binding force.[9]

In trailing the history of this subject matter in our decisions, we have come across several ones which present situations quite analogous to those in the present case, although they do not discuss the problem.

In *Moringlane & Lledó* v. *Skerret*, 44 P.R.R. 851, 858 (1933), an engineer had made a promise, voluntarily but under a certain condition, to deliver to a partnership one of the barges which the Municipality of Ponce leased to the latter.   The promise was not kept and the engineer was

---

stem from the isolated fact that it was expressed, but from its valuation together with the conduct of whomever has legitimately trusted the declaration.   The modern doctrine of 'social contact', which definitively is nothing more than the clear exposition of some indubitable criteria of juridical policy proclaimed in relation to a more careful and minute observation of reality, may simplify the understanding of the effects attributed in certain cases to the intention declared unilaterally and sustained, apparently at least, in the face of the actions of whomever may have counted on the declaration.   Therefore, it is appropriate to cite the intervention of Nirk, with reference to a study by Ballerstedt, to the effect that this author has shown the need to distinguish two fundamental forms of the validity of the intention to negotiate juridically: that which bases the obligation on the declared intent and that which should be based on the force of the trust placed in the declaration.   The same may be expressed by the language taken from the doctrinal scope of the *common law*: 'The typical minimum effect of unilateral acts is to create an estoppel.   It prevents the subject . . . to which the unilateral act is imputable, from acting contrary to its declared intent.'

"It may be objected that the protection of the trust placed in the declaration does not justify that it be decreed that the declarant is bound to comply with the same obligation offered, but that it may only justify that the scope of the prejudice suffered by whomever trusted be reckoned.   According to this opinion, the unilateral declaration of intention would only serve, in its case, to consider that the declarant has incurred in extracontractual liability."

[9] The doctrine laid down by the Judgment of March 21, 1957, LX *Jur. Civ.* (N.S.) 701 *et seq.* is as follows:

"Although it is true that the jurisprudential doctrine is not uniform, and in some cases it has denied effectiveness to the unilateral juridical business, which is revealed by the Judgments of January 12, 1881, April 15, 1924, and June 21, 1945, it is also true that the more copious and modern case law favor the acknowledgment, at

sued for damages. The judgment dismissed the complaint. We affirmed the judgment. We stated the following, in part:

"Such is the case. The question involved in it, and to be decided, is not easy indeed. While studying it, at times it has seemed to us that the plaintiff is right, but when we have tried to support this conclusion we have been unable to find a definite relationship by virtue of which the defendant is bound to the plaintiff in the manner claimed.

"Our Civil Code expressly recognizes that obligations arise not only from the law and from contracts, but also from quasi-contracts, which it defines as 'licit and purely voluntary acts by which their author becomes obligated to a third party, and from which there sometimes results a reciprocal obligation between the parties concerned.' Sections 1042 and 1787 of the Civil Code, 1930 ed. The code regulates two types only, namely, management of the business of another and acceptance of a payment not due; but we agree with the appellant that this does not mean that these are the only kinds of quasi-contracts which give rise to obligations enforceable in the courts of justice. So that, even though this case does not involve the management of the affairs of another, or the receipt of a payment not due, if any liability of the defendant to the plaintiff enforceable in a court of justice could be derived from the licit and voluntary acts performed by the parties, without previous agreement, the courts would be bound to recognize such a liability, with all its consequences. That proposition is simple enough. The difficulty lies, we repeat, in deciding whether or not the facts of

---

least by way of exception, of the validity of the unilateral obligation, in principle, and according to the attendant circumstances in the concrete case at issue, particularly if the declaration of intention is endowed with certainty and is addressed to a specific person by dispositive title and not by the mere statement of a purpose, for in these premises, *in genere*, it falls within the sweeping concept defined by § 1254 of the Civil Code, as a declaration of receptitious intention and entailing a credit right, which is received in juridical technique with attachment in the spiritualistic sense which the *Ordenamiento de Alcalá* stamped on our ancient law, buttressed by the exigencies of good faith and the security of commerce, as inferred from the Judgments of February 8, 1893, December 31, 1924, October 17, 1932, May 26, 1950 and December 1, 1955."

this case show a perfect quasi-contract between the plaintiff and the defendant.

" . . . Upon the defendant's failure to comply within a reasonable time, what were the rights of the plaintiff? In our opinion it should have continued to demand the return of the barge, and if it did not obtain this, it should have notified the lessor, with which it had executed the contract which clearly gave rise to rights and obligations, for the purposes of such action as might be proper. It did not do so. It preferred to allow the case to remain uncertain. And in our opinion it does not now have a clear and perfect right on which to base its claim against the defendant directly, especially since the record does not clearly show that the acts of the defendant have caused the plaintiff any actual damage which it may not recover by dealing directly with its lessor."

In *Mercado* v. *Mercado*, 66 P.R.R. 36, 86–87 (1946), we did not recognize the future binding force to a certain practice observed by a testator of aiding a number of needy persons, making them weekly donations of money. However, in the same case we compelled his heirs to fulfill the promises that the same person had made to various needy or impecunious students to pay their expenses until the termination of their respective studies. Because there was a request of the aid and the acceptance of the promise, as it appears from the record of the case, the same had developed into a contractual obligation transferable to the promisor's heirs. We stated therein.

" . . . by sending the students to educational centers on the continent and promising to give them financial aid until they finished their studies, performed a lawful and purely voluntary act, but upon his promise being accepted by the students the testator became contractually bound to the latter. If after that obligation had been contracted and the young men had commenced their studies, Mr. Mercado had refused to continue to pay their expenses, there is no doubt that he could had been compelled to perform the contract entered into by him. That obligation of the decedent, which was of a purely contractual character, passed to his heirs from the moment of his death, under § 610 of the Civil Code (1930 ed.).

"By way of illustration, we will state that in the American decisions cases similar to the present one have been disposed of by applying the doctrine of promissory estoppel.

"Mario Mercado Montalvo was not bound in any way to provide funds for the education of these impecunious young students. The offer which he made to them as a voluntary act of pure liberality, could have been withdrawn or revoked by him at any time before the promisees, relying on the promise, should have changed their position to their prejudice. The young men in question changed their position. They had faith in the noble and generous man who offered to them what their own parents could not give them: a career. They firmly believed—and in this they were not mistaken—that Mr. Mercado would fulfill his promise and not desert them before their goal was reached. And inspired by that faith in their protector, they renounced everything and went to the United States to study and to show, as they did, that they were worthy of the protection extended to them." [10]

The memorable professor JACINTO TEXIDOR, in his work *El Derecho Civil en Puerto Rico, Obligaciones y Contratos* states at p. 17, following Sánchez Román, that the law "and the facts" are the sources of all obligations; among them

---

[10] The application of the doctrine of "promissory estoppel" arose again in *Pabón* v. *Ayala*, 71 P.R.R. 878, 880 (1950). The particular circumstances of the appeal prevented us from expressing an opinion on its application to the case. In that case there was an attempt to enforce an alleged voluntary unilateral promise made by the owner of a farm by which he bound himself to give a right of way across his property to another person who wished to buy an adjoining farm. This other person maintained, relying on that promise, that he purchased the adjoining farm, but after having acquired it defendant did not fulfill his promise. The trial judge did not give credit to the evidence introduced to prove the existence of the promise and dismissed the complaint. In footnote 1 of the opinion we stated:

"[1] Appellant cites the definition of this doctrine given in 19 Am. Jur. 657–8, § 53, which reads as follows:

"'... According to that doctrine, an estoppel may arise from the making of a promise, even though without consideration, if it was intended that the promise should be relied upon and in fact it was relied upon, and a refusal to enforce it would be virtually to sanction the perpetration of fraud or would result in other injustice. . . .'"

For this same reason we did not apply it in *Luce & Co.* v. *Cianchini*, 76 P.R.R. 155, 167 (1954).

those that are licit, "voluntary without a meeting of the minds," or involuntary, but ascribable to a specific person and which generated certain responsibility.[11]

Professor VELÁZQUEZ in his textbook *Obligaciones y Contratos*, 1939 ed., points out at p. 13 that the unilateral statements of intention liable to create obligations are not numerous and that they are submitted *mutatis mutandi*, to the general rules which regulate contracts. In his article *La Consideración, la Causa y el Derecho Puertorriqueño*, published in XVI-2 *Revista del Colegio de Abogados* 5 (1956), he maintains that "in civil law the unilateral intention may be a source of obligations." In the revised edition of 1962

---

[11] From the First Conference on obligations which appears in the afore-cited treatise by the learned civil law scholar and former Justice of this Court, we have taken these guiding teachings which we copy below, yielding to the irresistible temptation to reproduce them as a homage to that privileged mind:

"How we shall study the Code? The answer, in our opinion, is simple: studying civil law.

"The study of law is in vogue today, not because of the law itself but because of its jurisprudence. We respect the system, but we shall not follow it because it does not give us sufficient confidence, and because we have no faith in its result.

"Case law, respectable as it is, is not the law. Above all we do not conceive case law except as a means of *interpreting* the legal provisions. It is undeniable that there are hundreds of legal provisions which have never required interpretation, and the application of which has never been submitted to the decision of a court. Hence, to go strictly by the case law means we do not reach those legal provisions.

"Case law is changeable. Even unstable in some cases. Law, in its lofty principles, is not.

"Case law refers to concrete cases, with special factual particulars; take or substitute a fact or a circumstance, and the decision of the court may be different. Let us not forget the famous saying 'Justice is, what out of five, three decide.' In the law we do not run this risk.

"The study of the law through the case law besides clothing the latter with the majesty that only belongs to the law, and of the juridical sensibility of the judges of a court, has other serious disadvantages. It is easier to know what was said on a certain occasion, than to decide in the light of certain principles, whether or not that was well said, whether something else should have been

of that textbook, at p. 14, he considers that "the source of voluntary obligations is essentially contractual," quoting the well-known jurist Josserand. As stated by Rojina Villegas—work and volume cited above—and RAYMUNDO M. SALVAT in I *Tratado de Derecho Civil Argentino, Fuentes de las Obligaciones* 1-11 (2d edition 1957), in France the problem continues to be a target of passionate criticism and the doctrinal movement has favored the law and the contract as principal sources of civil obligations, on the basis that every obligation supposes not only the will of the obligee, but also the intervention of the creditor, because no one may

decided, and why. It is much easier to learn of another's opinion through reading, than to form one's own opinion through study.

"But in law one must have one's own opinion. You can not change the law of a country by alleging as an argument that a high judicial authority has construed it in a particular sense; but you will do so by showing that the existing law departs from the high principles of justice.

"If we study Law, we must start from a point of origin: Justice, Moral, Juridical Ethics. What is just?—that is the first question we should ask ourselves.

"Let us first posses the philosophic and moral principle. Each time we study an institution, let us start by inquiring into the philosophic, immutable, eternal principle which created it, and governs it.

"But, is that all?

"Although the principle may be unique and uncontrovertible, all legal institutions have had historical, circumstantial changes, changes of development and exteriorization. It is necessary that we know the history of each one of them.

"And knowing the ethico-juridical principles, of the philosophy of the institution, and of its life and development, let us delve into the study of their present status. And with those elements, let us make the critical study of what prevails in the subject.

"And thus we shall have our own concept, born of our study, not beggared from another's mind and thought.

"Let us make the study as jurists; that is what we are aiming at; and only by that path shall we attain our aspiration.

"Master of those principles, the source of the light is found within ourselves; with it we illuminate the theory and the series of facts which appear in each case. We focus from within to without; the light does not come to us from a phrase in this and another in some other judgment; we have the sunlight of the principle, and that is sufficient."

be a creditor against his will, especially respecting a benefit or undesirable or undesired profit.[12]

Because consensual perfection is unnecessary in view of its unilaterality; because it would suffice for a person to make a simple declaration in order that another, in bad faith, should attempt to use it in support of the creation, transfer, modification and suppression of rights; because the clarity and certainty of transactions should be maintained, such are the reasons why undoubtedly, various modern Codes have accepted and regulated the unilateral promise of an undertaking by way of exception, respecting isolated cases, and have not given it a wide and general application in the field of juridical businesses. The mere fact of regulating

---

[12] However, Professor SALVAT himself, relying on the French exponents of the theory favoring binding efficacy, at pp. 10 and 11 of the afore-mentioned volume I, advises the acknowledgment of the binding force in the following paragraphs:

"It is impossible, in the name of traditional principles, to reject a theory stemming from a requirement of modern commerce, which demands speed and security in the transactions.

"It is true that the recognition of the binding force of the uni-lateral intention 'constitutes the very negation of the concept of obligation'; yet, it is nonetheless true that it is not sufficient to decree its excommunion, since such a thing would be equivalent to denying the juridical evolution in itself.

"As Edmundo Picard has written, 'the law, like all physical and intellectual nature, is constantly transformed into the reality of its concrete or positive manifestations. It is essentially variable and *protean;* it is constantly in the process of unmaking and remaking. It is found in a perpetual state of formation. It develops continuously as a web woven in the gigantic cylinder of fate. Uninterruptedly, it ejects its intimate force into space in ever-fresh images. It is a constant flux of fleeting phenomena replaced by other phenomena. It is the juridical *processus* which is effected with the logical fatality of a live thing, setting in motion what was conceived.'

"If such is the law, if its life is a *constant remaking,* why should we be remiss to seeing that the very notion of obligation be changed, by discarding or at least modifying its centuries-old concept? For new needs, new concepts.

"The idea of obligation as an exclusive source of a meeting of the mind, is the maximum exaltation of individualism. To say that my promise, freely and spontaneously made, has no binding force until another person accepts it, is that not the same as to dispense

492

it exceptionally may be considered as a policy of caution and prudence.[13]

German law, considered the birthplace of the unilateral promise as a source of obligations, recognizes in §§ 657 *et seq.* and 793 of its Civil Code the following forms of unilateral declaration of intention: (1) the promise of foundation—devoting the property to the permanent fulfillment of a legitimate human purpose in favor of other persons, (2) that of reward, (3) the public offer, and (4) the stipulation in favor of a third person.

Our Civil Code in its § 1209 grants binding force to the stipulation in favor of a third person, but under condition that the latter "has given notice of his acceptance to the person bound before it may have been revoked." In these cases, upon accepting the stipulation and notifying the person bound, an agreement is concerted and the third person becomes a contracting party respecting the stipulation which benefits him. If even though he accepts it, he fails to give notice of his acceptance to the person bound in the

---

with the social means in which the promisor is acting and to disregard all those which could have legally confided therein?

"Once a proposition is uttered in the social medium—as Demogue has sharply pointed out—the determined or undetermined addressees, upon acknowledging it, act accordingly, they trust the proposition made. There is a real interest in saying that it should be maintained thereafter. Otherwise, damage would be caused. If I am promised an advantageous transaction, I shall promptly reject others less favorable which are offered to me.

"It is for this reason and to the extent in which social interest requires it, that we consider it necessary to recognize that unilateral declaration has binding force, as advised by the most modern doctrine and as accepted by the Codes underlying it. The form and to what extent it should be sanctioned in the law is a problem of legislative technique reserved to the wisdom of the legislator. What matters is its incorporation into positive law, and this seems to be a solved problem at present."

[13] The Mexican Civil Code, allegedly the one which has accepted it most sweepingly, in addition to the special provisions regulating it, provides in its § 1859: "Legal provisions on contracts shall be applicable to all agreements and to other juridical acts insofar as they oppose the nature of same (referring to the Code) or to special provisions of the law regarding the same."

manner provided by said section, he shall lose his right to demand its fulfillment. We so decided in *Gelabert et al.* v. *Sánchez*, 26 P.R.R. 592, 595 (1918).

In the area of real rights it is juridically possible that some of them, as real estate servitude (§ 472 of the Civil Code), usufruct (§ 397), use and habitation (§§ 451, 452 and 453) and mortgage (§ 1756, last paragraph, Civil Code, and §§ 116 and 138 of the Mortgage Law), may be constituted by a unilateral act. Although granted by law, the right to repair damages is created when the culpable action or negligent omission is effected without the need of the injured party's knowledge or consent. In the law of succession we see that the succession is granted "by the will of the man as expressed in a will or, in its absence, by provision of law," that the will is absolutely a personal act, that what clearly appears to have been the will or intention of the testator prevails over the words of the will and that, in certain cases, even when the will is revoked, it does not lose its legal force. Section 604 *et seq.* In business law we find negotiable instruments to bearer which are valid without the need of a meeting of the minds between the drawee or obligee and the holder or creditor, and as GARRIGUES states in his afore-cited work, "the reality of traffic shows us that the contract is not the only source of obligation; the unilateral declaration of intention which has juridical effect in some cases is also a source."[14]

In our juridical order, as long as it is not contrary to law, to morals, or to public order, nothing prevents a person with full capacity to act and with the intention to bind himself of his own conviction and firm resolution, from being bound by law, merely by his unquestionable unilateral

---

[14] GIORGI states in his classic work *Teoría de las Obligaciones*, vol. 3, p. 29, 7th ed., translation by *Revista General de Legislación y Jurisprudencia* (1929): "The sense of loyalty in the spoken word has been innate and the imperious tendency to confide in promises has been instinctive."

494

declaration of intention, to give, to do, or not to do, something possible in favor of another.

Of course, in a simple obligation without a typical consideration, condition, counterpart, or correlative promise to compensate it, sometimes out of pure charity, its fulfillment may result excessively onerous for the promisor. The obligation must be derived from a competent juridical act to produce it.[15] There must be no uncertainty either in the manner in which the declaration is stated or in its substance or content.

■ The provisions of our Civil Code on obligations and contracts, either the general ones or the very specific ones, according to the nature of the unilateral declaration as revealed by the facts and attendant circumstances in each case, should be applied or observed upon the determination of their existence, validity and efficacy. Thus, even when it should be fulfilled within a term and such term is not indicated, the court may indicate them pursuant to § 1081 of our Civil Code, or in the case of an obligation which is excessive or extremely strict, similar to a penalty, they may modify it equitably (see its § 1106), or reduce it "to the amount it may exceed the customs of a good father of a family," as stated by § 1701, respecting the civil liability in non-prohibited games or bets.

■ Once the promisor is firmly bound to make his promise good, he should fulfill it by its own terms, being subject, of course, in case he proceeds to fulfill it by fraud, negligence or delay, or to violate it in any way, to compensate for the damages caused, pursuant to the provisions of § 1054 of

---

[15] The mere expression or utterance of an intention or desire is not sufficient to generate an enforcible right. It should not consist of a simple offering to comply with a duty of a pure moral or social order, without coercive effects and unable to create a binding civil relationship, and the noncompliance with which, as stated by JACINTO TEXIDOR, "is sanctioned in the sanctuary of one's own conscience and, at most, in a social sphere."

our Civil Code, which refers to all kinds of obligations whatever their origin may be.[16]

In the light of all the foregoing respecting the binding efficacy of the unilateral declaration of intention, let us now consider whether the judgment against Rosendo Gautier was juridically well founded.

He is sued for an alleged Aquilian fault; he is sentenced for his "contractual obligation." In our opinion, Rosendo Gautier could not be made liable either for the first or for the second reason.

■ We immediately discard the alleged Aquilian fault because no evidence whatsoever was introduced either directly or indirectly, of the allegation of the complaint which stated that "At the time of the accident defendant Eliezer Gautier Benítez acted as agent or employee of defendant Rosendo Gautier and in the course of his employment." It was clearly proven at the trial that at the time of the accident (a) Eliezer was driving his own automobile;[17] (b) that he was returning home; (c) that he had already finished his working day with his brother, and (d) that he was not performing any act whatsoever in the benefit or interest or by order of his brother Rosendo, or by reason of, nor during the course of his employment with the latter.

A contractual obligation was never established. No contract exists unless there are the essential requisites of consent

---

[16] Within our private order, generally, any act of man, if it causes damage, obliges the wrongdoer to repair it. That is why we have never felt tied to the archaic concept that there is no other liability than that which is born out of a contract or of guilt.

In these cases the courts should feel free to penalize the promisor who has violated his promise in bad faith, in the absence of other sanctions expressly fixed by law, either by compelling him to comply with the promise specifically or by merely imposing on him the obligation to compensate the damages resulting from the trust placed in the declaration, according to the attendant circumstances.

[17] It was error of the trial court to consider Eliezer's automobile a "commercial vehicle." Pursuant to § 2(e) and (g) of Act No. 279 of 1946, it was a "private service automobile." It should be observed that the definition of "commercial vehicle" in § 1-149 of Act No. 141 of 1960, as amended by Act No. 91 of 1961, expressly excluded the station wagon.

of the contracting parties, a definite object which may be the subject of the contract, and the cause for the obligation which may be established.—Section 1213. There was never any agreement or pact whatsoever between Rosendo and plaintiff, by which the former bound himself, for sufficient cause, to repair the damages ascribable in law only to Eliezer. It appears from plaintiff's own evidence that when his brother explained to him "what the gentlemen has spoken about," plaintiff "did not say anything."[18]

In his brief plaintiff-appellee himself admits the absence of the contractual obligation.[19]

Rosendo Gautier was never asked to fulfill his so-called contractual obligation to compensate. The complaint filed several months after the supposed promise was made was not based on such contractual obligation. From the commencement of the action until the day of the trial five years elapsed during which not one of plaintiff's four competent attorneys had the thought of amending the complaint for the purposes of basing it on a "contractual obligation" respecting Rosendo Gautier Benítez. Moreover, when on the day after Rosendo donated the amount of $20 to buy blood, another liter of blood was needed, not Rosendo but another person named "Blas Benítez" was asked to pay for it.

Thus, the conduct of plaintiff and his brother after the alleged assumption of the "contractual obligation" is not in harmony with the firmness, certainty and existence thereof.

---

[18] Plaintiff's brother said later, but as a matter of opinion, that "he accepted the statement."

[19] It is said at p. 9 of that brief:

"The fact that the court stated in its judgment ('Rosendo bound himself wilfully and validly to compensate plaintiff, and this in itself is sufficient') does not mean that a contractual relation was established, as it seems appellant pretends. A similar situation arose in the case of *Ramos et al.* v. *López*, 36 P.R.R. 451: 'and there was also the statement made by the defendant himself, as testified to by one of the complainants, that he, the defendant, if it was shown that the peon was driving the truck, would make good to the complainants.

" 'The appellant says that if the complainants relied on his statement, the action should have been founded on a contract. We see

No trust was attached to the statements made by Rosendo Gautier. As a result thereof, no damage, injury or harm was suffered by plaintiff. The different ways of reproducing the statements of Rosendo Gautier made at the moment in which he was fulfilling his humanitarian duty of donating $20 for the purchase of a liter of blood; the absence of the testimony of Visitación Sáez, public employee who was said to have been present at that moment, the sole motive which led plaintiff's brother to Eliezer's father, at first, and then, to Rosendo's residence, are not persuasive circumstances to believe that there was in the latter the intention to bind himself unconditionally respecting the serious solidary liability without fault or without a corresponding substantive debt.

The three reasons which the trial judge thought "why Rosendo bound himself" constitute a game of hypotheses and inferences not supported by the evidence. The evidence, on the contrary, is more favorable to the forming of those hypotheses and inferences in their negative form.

The allegations and evidence as a whole show that such statements made by Rosendo Gautier were introduced by plaintiff for the exclusive purpose of proving the alleged relation between employer and employee between the Gautier brothers, without considering that they were sufficient in themselves to make Rosendo liable for the damage attributable to Eliezer and much less to expect that they should create in the mind of the trial court the picture of a "contractual obligation."[20]

---

no contract in the statement of Heraclio López. The complainants were using this statement as tending to show that the truck was being driven by a peon and that this peon was an employee of the defendant.' "

[20] In his brief at p. 9, plaintiff-appellee states the following:

"As may be seen, in the aforesaid case like in this one, defendant's statements were admitted and considered by the court for the purposes of determining the relation between the driver of the vehicle and the defendant. Appellant can hardly contend that this constitutes a new different cause of action which arose out of an alleged contract."

498

It appears from the record that the judge was aware of the true purpose of plaintiff in introducing evidence of the statements of Rosendo Gautier. In spite of having admitted them in evidence, the judge did not determine that the private automobile which injured plaintiff belonged to Rosendo Gautier, nor that he used it for the purposes of his enterprise, nor that Eliezer at the moment of the accident was acting as his employee. The so-called admissions against the interest of Rosendo Gautier were useless and ineffective in proving those particulars. The situation of facts in the case of *Guzmán* v. *Ortiz*, 39 P.R.R. 170 (1929), is entirely different from that in the present case.

In view of all the attendant circumstances, those statements were insufficient to establish a binding unilateral obligation and, much less, a contractual obligation. To give or to attribute to those statements (accepting, of course, that they were made) a legal scope or juridical consequence which they could not have or produce, and to order codefendant to compensate a damage which he did not cause, is a serious error which warrants the reversal of the judgment respecting codefendant Rosendo Gautier Benítez.[21]

---

[21] Under the facts involved in this appeal and in view of our final conclusions, we need not pass on the question of whether the pleadings should be considered amended in order to conform them to the evidence, pursuant to Rule 13.2, nor the application of Rule 44.3.